And we'll go on to the next and final case on the calendar today. It is labeled two different ways. Depending on which calendar you're looking at, it's either Kauffman or Owens v. Satellite Healthcare. Whenever you're ready, counsel, we're all set. May it please the court, good morning. My name is Erin Sweeney. I represent Respondent Depellent Satellite Healthcare. I'd like to reserve three minutes for rebuttal. So this is the kind of labor case that needs a roadmap at times, or it could be easy to get lost. Satellite's appeal here is fairly limited, and it's focused more on some glaring deficiencies that are very fundamental to the district court's order of this preliminary injunction. And my goal today would be able to provide the court with a shortcut on that path through the briefing and the evidence to quickly get to the point to see how the order is deficient and should be reversed. Last fall, the regional director of Region 20 in San Francisco petitioned the district court for a preliminary injunction restraining and asking for affirmative relief based on approximately ten charges and two complaints that the region had issued, one in 2023 that covered about nine unfair labor practice charges, though a variety of different allegations, and as well as a second complaint that was issued in 2023. So where did the district court err here? The district court erred in its application of the second element, the winter test. So the four factors that the court must weigh and look at, whether it can issue a preliminary injunction even in the 10J proceeding. If you look at it, it erred in a variety of different ways when applying that second element for irreparable harm. So right at the outset, I just want to make sure that I'm understanding your argument, because I read your briefing to be skipping the first component of the winter factors, which we've consistently said is the most important, and that is likelihood of success on the merits. But I just want to make sure I'm not overstepping. Is that right? Yes. Okay. But the courts have also said that even though the first element might be met, that does not automatically entitle the regional director to an injunction. The second element must also be met. I appreciate that. We've consistently said it's the most important. You're not challenging it. I — you were going on to the second factor in response to Judge Bress's question, so I just wanted to make sure I'm not missing anything. Go right ahead, please. Sure. So that second factor for irreparable harm has to be established if the unfair labor practice, the likely unfair labor practice that is shown in the first element, along with a present or impending or an imminent effect of that unfair labor practice is not cured by later relief. So there's a couple of issues when you look at the court's order and decision here, the first being that if you look at what the court in the first factor says are the allegations that there is a likelihood on the merits. And I'm just going to do some rough math to kind of cut it down here. There's about seven, I think what I counted, about seven allegations that the court says that they find that there's a likelihood on the merits. When you get to the second element of the court's order and it's analyzing irreparable harm, the court only points to, I believe, three, and makes no attempt to analyze — I want to make sure my math is correct there — yes, three, an 8A5 allegation about 2023 merit increases at four centers, an 8A3 allegation about 2023 and 2024 merit increases, and then a termination of an employee at a Vallejo center. That analysis — What she's citing is — I think I would pack those a little bit differently, but if we can back up, are you — is your problem that you think that she didn't show that the harm flows from each of the issues that she found that the regional director would likely succeed upon? In other words, why would three be inadequate? She's supposed to be looking to make sure that the bargaining process is not harmed, preserving the status quo. I'm not sure why one wouldn't be enough. Am I missing something? Well, I think with the — yes, with the scope of the order, if the order is enjoining or an affirmative relief about bargaining over the change in unilateral policies at — about attendance and those kind of matters, and there's been absolutely no analysis whatsoever about whether there's any kind of present or imminent harm that could be the effect of that actual or likely ULP, that can't be cured by later relief. But scope is a different question. Scope is a different question. You were just responding to Judge Bress about the harm and why you think that there wasn't a sufficient showing of harm under the winter factors. Correct. So it's a two — kind of two-factor analysis, I think, that under this second element. Not only was there not an analysis of the allegations and charges that eventually were incorporated into the order and that was restrained, but then also the analysis that was done was not sufficient based upon the evidence and the record and the conclusions that were drawn, even for those that were actually considered and contemplated. And I can get to that as well. So — Well, I guess I'm — I'm struggling a little bit with where you think the error is, because is the error in the factual findings about the lack of union support following some of these actions, or is it the error in not connecting the lack of union support to the violations? Both. So I think that the evidence itself that the court points to, or at least the conclusions that the court draws about the evidence, are not supported by the actual evidence. And then I also think that that evidence itself does not meet the standard of being present, eminent, or injurious effect in the — in the future — or in the current sense that can't — and also that can't be cured by later review. So the district court found that the — there was a decline in employee morale. There was a decrease in union participation. There's evidence that employees are electing to leave unionized clinics, to go to non-unionized clinics, that the union is struggling to organize new clinics. So were those findings erroneous? We believe so. So the — for example, if you — the actual evidence that was presented about morale and decrease in — or, let me see, my example would be union struggling to organize new clinics. The actual evidence that the court pointed to to make that conclusion is the declaration of one employee at one center out of all these 11, and it was a statement about a conversation he had with a coworker in 2023. And this was also an employee who was deposed, and their entire deposition transcript is on the record. If I can interrupt, I may agree with you that they may not be the strongest evidence, but we review this, what, for abusive discretion? I think what the problem is, is that looking at all of the evidence altogether, there isn't this evidence of this imminent effect that is happening at the time that the injunction has put into — is put into place. But Judge Lee is right about the standard of review. And unless you can tell us otherwise, this is — you know, we look at the winter factors and impositions of these kinds of injunctions a lot. And what she had here is that the four clinics that had chosen to unionize in December of 2022, the Vallejo Clinic in April of 2023 by a vote of 22-2, three more in June, and then by September, there's one union that voted to unionize by one vote. By February of 2024, there was a clinic that turned down the opportunity. And then, of course, throughout this timeline, there was dwindling support, as indicated in some of the testimony, you know, people failing to show up and attend union events and whatnot. And the goal of this type of injunction, of course, is just to maintain the status quo. And what she's got is — and I think it's uncontested that after this clinic voted to unionize — or the four voted to unionize, there was delay until from December all the way to September, about nine months before there was bargaining started. And in that time, there were unilateral changes by the employer, including withholding merit increases only from the clinics that had voted to unionize, but paying them to the clinics that had not. This seems like a very powerful record to me. Well, there's also evidence on the record that was dismissed in that exact same time period that the union also organized, I think, six or seven other locations and won elections. Well, I think I just want to walk through that. And when you say dismissed, I don't — do you think she failed to consider the evidence? Yes. Why? I think — You found it outweighed, but it doesn't take a lot to imagine that there's — the union — the bargaining process is going to be harmed if the employer stops paying annual raise increases that have been established, an established course of conduct, only to the folks who voted to unionize. I think what the conclusions were made were that — or let me back up — that when you put the evidence that the region actually brought about that time period and the merit increases, it does not demonstrate — there was no connection or demonstration of this ongoing harm, even as to today and a year later, that the board cannot remedy. And that is the other element that was not considered, which is whether this was some kind of — if there is an impact that the board could not remedy. Okay. The other aspect of the challenge to the consideration of irreparable harm is the fail to also consider the significant delay and the evidence that was brought about that. And this Court has said that the significant delay or delay in the process can be evidence to counteract whether there is an impending or, you know, present impending irreparable harm. And that evidence, as well, was presented and was not considered. Can I just — I just want to be clear. When you say it wasn't considered, I fully appreciate that it didn't carry the day. But are there indications in the record that the judge refused to consider this evidence? It's quite different when you do what we do for a living, if a judge refuses to consider evidence. And so I'm just not — I want to be sure that I understand your argument here. Sure. And I would have to double-check, but my recollection was that it was not something that was — Even so, what material delay are we really talking about here? We're talking about the delay, for example, with Mendoza and the termination. The region issued the complaint initially on all the Vallejo charges in November 2024. The region then decided to — and that was set for a hearing in March. And that included, as well, the allegations about termination. The region then chose to wait and amend that complaint several months later to add, I think, about eight or nine other allegations that were unrelated to the Vallejo complaint and push out the hearing until later in the summer. The 10-J was then brought in October, almost a year later. So at this point, almost a year and a half after this termination happened. We think that's evidence that shows that there was, at least in this circumstance, not the adequate irreparable harm that a 10-J should be based upon from that delay itself. This is not the delay — I'm sorry. This is not the delay, which I know that the courts have seen, which is — and incorporated, which is, of course, there's an administrative delay as the processes go on. But this was a delay after the issuance of the complaint, and 10-J is triggered once upon the issuance of the complaint. We're taking you into your rebuttal time. Would you like to reserve? Yes. You bet. We'll hear from opposing counsel, please. Go right ahead. May it please the Court, good morning. My name is Lori Duggan, and I represent the National Labor Relations Board. Your Honors, this case is about hard-earned pay raises withheld from employees working at dialysis clinics across the state of California simply because they unionized. The company, as we just heard, concedes that it withheld these raises from employees for non-financial and non-merit reasons. So, in other words, it's not that the company couldn't afford to pay employees its raises, and it's not that the employees did not deserve or were not eligible for the raises. It's simply because the employees at those clinics voted to go union. And Judge Christin, as Your Honor pointed out, at the same time that the company withheld these raises from employees, they also gave them to non-represented employees at other clinics. In addition to that fact, employees at at least four clinics were denied their hard-earned raises two years in a row, in 2023 and 2024. Opposing counsel seems to concede that the clear showing of likelihood of success on the merits was met, but appears to dispute that there were record findings of harm. As Your Honors pointed out, the district court at pages 16 to 18 of its order carefully and in a detailed manner went through the record findings of harm that were, in this case, abundant. There's nothing unusual about this case. There was ample, as the district court said, abundant record evidence of harm. That harm flowed primarily from the withholding of wage increases, but also from the discharge of active union supporter nurse Kathy Mendoza at the Vallejo Clinic. Does there need to be record evidence that specifically connects the harms the district court identified to the specific unlawful actions? Does there need to be record evidence saying the reason that the Vallejo Clinic is struggling is because Ms. Mendoza was terminated? Or is it enough to kind of have unlawful violations, have evidence of some things that have happened that are harmful to the union and union employees, and then to draw the connection between the two as a legal matter? Sure. Your Honor, in this circuit, it is enough. The former is enough. In this circuit, there is precedent, controlling precedent, that merely requires a party to find that there is harm flowing from the nature of the unfair labor practices at issue. But in this case, although the district court did briefly connect the nature, the severe nature of the unfair labor practice violations in this case to inferences of harm, the district court did not rely on inferences here. The district court, again, in a detailed and careful manner, laid out the record evidence of harm that exists in this case. Your Honors, in Volume 10 of the excerpts of record, that is the place in the record that contains affidavits from several, both bargaining committee members and employees who work at these clinics, and also from union organizers who helped to organize the clinics. And that affidavit testimony shows that over the course of the organizing campaign, after Nurse Mendoza was terminated, there was a first round of employee support having been shilled. And employees fearing retaliation as a result of seeing their coworker get fired. After the wait, Nurse Mendoza was fired after the first round of raises were withheld at the first four clinics to unionize. So that was April of 2023. Mendoza was terminated in June of 2023. Again, there was another round of withholding of raises in 2024. And there is, again, abundant record evidence of harm flowing from the withholding of raises in 2024. In that regard... Sorry, for the firing of Nurse Mendoza, can we impute that to other sites? I mean, would they even be aware of her being fired? You know, potential loss of morale in other sites? Yes, Your Honor. It would be reasonable to impute that harm to other clinics. There is record evidence showing that employees working at one clinic helped to organize employees working at other clinics. So there is evidence on the record that employees at different clinics at times talked to each other and might have heard that Mendoza was fired. What are the most probative declarations on the connection between the harms and the unlawful actions? Your Honors, one of the strongest showings of harm was the diminution of unit employees at the Morgan Hill location and at the San Francisco location. So at Morgan Hill, the unit dropped from seven to five employees. It lost two of its employees. In San Francisco, the unit dropped from 17 to 10 employees. It lost seven. Due to the wage increase issue? Yes, Your Honor. There is record testimony that employees were frustrated that their wages were withheld. Around that time, employees also started to learn that employees at the first four clinics had their raises withheld. Wage increases? Wage increases, yes. Yes, Your Honor. Wage increases withheld. And they began expressing frustration at how long the bargaining was taking. Albert Lee is an organizing committee member who testified, we didn't know how long we would have to wait for bargaining. We thought bargaining would not take this long. Employees were assured by the union that they would get their raises through the bargaining process, but when they didn't get them for the second year in a row, it predictably caused an erosion of union support across the clinics. Can I ask, are the negotiations ongoing? Or have they achieved a collective bargaining agreement? The negotiations are ongoing. The parties have not achieved a first contract. And, Your Honors, this is an extremely important time in collective bargaining for parties who have recently been certified. The first contract is not only a critical period because employees are more susceptible to management misconduct, as has been recognized by many circuit courts, but also because the first contract forms the foundation for the negotiations moving forward. That's the basis upon which the union has to work to bargain over terms and conditions of employment into the future. Further questions? I don't think we have further questions, Counsel. Your Honors, because the district, again, this is not an unusual case, because the district court acted well within its permissible range of discretion, we respectfully request that this court affirm the district court's injunction. Thank you. Thank you for your argument. Counsel, you reserve some time. I'd like to just clarify a few of the things that the statements were made. Sure. I don't believe there is evidence that the alleged drop in the unit, I believe it was San Francisco and Morgan Hill, was due to wage increases. The evidence in that situation was a declaration from an organizer who merely stated that, but did not make any kind of correlation. For that evidence, yeah, I understand your points. Correlation, not causation. But did Satellite offer countervailing evidence? I don't know, an exit interview saying I'm leaving because I found a better job, I'm moving? I don't believe we were afforded the opportunity. So the burden as well was on the regional director to prove that part of the element or of the case, and the evidence that was provided made these certain statements, but there were no actual kind of connections between that and the merit wage increases. The three or four witnesses that we did depose and whose testimony is on the record also did not make those kind of correlations as well. I think also the precedent that I know from this district about the harm flowing in the nature of the ULPs, most of those cases all involve a refusal to bargain altogether or withdrawal of recognition from the union. Those cases involve where the company or the employer has essentially cut off the union relationship altogether, and that is where the courts have awarded the preliminary injunction saying that, you know, there would be no way to remedy this, there would be no way to pay employees back if they weren't able to bargain or have access to this union representation during the administrative process. And that is just not the same situation here, as Your Honor mentioned. Well, I'm not sure it isn't, counsel. There was a finding that there had been a failure to bargain in good faith, and there was a nine-month delay in trying to get even to the first negotiation session. There's a delay in providing the requested information that ultimately seemed to be The evidence showed it was readily available. And then there's the withholding of the merit wage increases for 2023 and 2024. But the union did not — was not removed from its position, and the parties continued to engage in bargaining. Well, but they weren't. I mean, that's the problem. There was no negotiations at all for the first nine months or even the provision of the requested information. But again, that is not an effect that is occurring today that the preliminary injunction is going to affect. And that's not something that — No, it just seems — and I'll just — in case you think I'm missing something, the purpose of this type of injunction is to make sure that the bargaining process is not damaged in the meantime so that it can go forward. And ultimately, it's to maintain the status quo. So what seems to me what the trial court had was a record that the status quo was not being maintained, that the union was being harmed. What are we missing? Correct. But under that reasoning, by the time this came to the district court, that the delay in the information or the delay in starting bargaining was a year past. So the impact — Water under the bridge? Is that your — Well, if the point of the injunction going forward is to — Maintain the status quo so the bargaining can go forward. Maintain the bargaining. The bargaining has happened. And as I think the court even noted, that there was no evidence that after the bargaining started that the parties had not continued to regularly engage in good-faith bargaining. All right. I think we understand. I've now taken you way over your time. Thank you for your patience with our questions, both of you, for your oral argument. We'll take that matter under advisement, and we'll stand in recess for the day. All rise.
judges: CHRISTEN, LEE, BRESS